1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                  - - -

4    CRYSTALLEX INTERNATIONAL CORP.,
                                        :      CIVIL ACTION
5              Plaintiff,               :
     v                                  :
6                                       :
     PETROLEOS DE VENEZUELA, S.A.;      :
7    PDV HOLDING, INC.; and CITGO HOLDING,:
     INC., f/k/a PDV America, Inc.,     :
8                                       :      NO. 15-1082-LPS
               Defendants.             :
9                                          - - -

10                        Wilmington, Delaware
                         Tuesday, December 20, 2016
11                       Oral Argument Hearing

12                                 - - -

13   BEFORE:        HONORABLE **LEONARD P. STARK**, Chief Judge

14                                 - - -
     APPEARANCES:
15

16             RICHARDS LAYTON & FINGER, P.A.
               BY:  RAYMOND J. DiCAMILLO, ESQ., and
17                  TRAVIS S. HUNTER, ESQ.

18             and

19             GIBSON, DUNN & CRUTCHER, LLP
               BY:  ROBERT L. WEIGEL, ESQ.,
20                  JASON W. MYATT, ESQ.,
                    RAHIM MOLOO, ESQ., and
21                  LINDSEY D. SCHMIDT, ESQ.
                    (New York, New York)
22
                         Counsel for Crystallex
23                       International Corp.

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter

```
1    APPEARANCES:  (Continued)

2

3              MORRIS NICHOLS ARSHT & TUNNELL, LLP
               BY:  KENNETH J. NACHBAR, ESQ.

4
                       and
5
               EIMER STAHL, LLP
6              BY:  NATHAN P. EIMER, ESQ., and
                    GREG SCHWEIZER, ESQ.
                    (Chicago, Illinois)
7
                           Counsel for PDV Holdings, Inc.,
8                          and CITGO Holding, Inc.

9
               PROCTOR HEYMAN ENERIO, LLP
10             BY:  SAMUEL T. HIRZEL, II, ESQ.

11                     and

12             CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP
               BY:  JOSEPH D. PIZZURRO, ESQ., and
13                  JULIA B. MOSSE, ESQ.
                    (New York, New York)
14
                           Counsel for Petroleos de Venezuela, S.A.
15

16

17

18

19

20

21

22                         - oOo -

23                   P R O C E E D I N G S

24             (REPORTER'S NOTE:  The following hearing was

25   held in open court, beginning at 3:00 p.m.)
```

1          THE COURT:  Good afternoon.

2          (The attorneys respond, "Good afternoon, Your

3     Honor.")

4          THE COURT:  I'll have you put your appearances

5     on the record for us, please.

6          Good afternoon.

7          MR. DiCAMILLO:  Good afternoon, Your Honor.

8     Raymond DiCamillo of Richards Layton & Finger on behalf of

9     Crystallex.  With me this afternoon from Gibbons Dunn &

10    Crutcher, Robert Weigel, Jason Myatt, Rahim Moloo, Lindsey

11    Schmidt, and also Travis Hunter from my office.

12         THE COURT:  Okay.

13         MR. DiCAMILLO:  With the Court's permission

14    Mr. Weigel will be speaking upon behalf of Crystallex today.

15         THE COURT:  That's fine.  Welcome and good

16    afternoon to all of you.

17         MR. WEIGEL:  Thank you, Your Honor.

18         THE COURT:  Thank you.

19         Good afternoon.

20         MR. HIRZEL:  Good afternoon, Your Honor.  Sam

21    Hirzel from Proctor Heyman Enerio on behalf of Petroleos de

22    Venezuela, S.A., or "PDVSA" as the name is being referred

23    to.  With me at counsel table is Joseph Pizzuro and Julie

24    Mosse from the Curtis Mallet-Prevost firm.

25         THE COURT:  Welcome.

1          MR. HIRZEL:  Mr. Nachbar also has a couple of

2     introductions.

3          THE COURT:  Okay.  Thank you.

4          Good afternoon.

5          MR. NACHBAR:  Good afternoon.  Kenneth Nachbar

6     of Morris Nichols Arsht & Tunnell here on behalf of PDV

7     Holdings.  With me in court today are Nate Eimer and the

8     Greg Schweizer of the Eimer Stahl firm.

9          MR. EIMER:  Good afternoon.

10         THE COURT:  Welcome.  Good afternoon.

11         MR. NACHBAR:  Thank you, Your Honor.

12         THE COURT:  So we're here on several issues

13    today.  We have the motion to dismiss.  We also have the

14    motion for the certification of the interlocutory appeal.

15    I am also aware there is the newer case which has an

16    outstanding dispute with respect to an answer or response.

17         Have you all -- should I gather from where you

18    are all sitting you figured out what we're doing first or

19    have you conferred about that?  Do you have a view?

20         MR. WEIGEL:  We did speak, Your Honor, very

21    informally, but with the Court's permission, we thought it

22    made sense to do the motion to dismiss first.

23         THE COURT:  I take it that you agree?

24         MR. PIZZURRO:  Yes, Your Honor.

25         THE COURT:  Okay.  Any objection?

1          MR. EIMER:  No objection.  We defer to our

2   parent.

3          THE COURT:  Let's hear the motion to dismiss first.

4          MR. PIZZURRO:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon.

6          MR. PIZZURRO:  Your Honor, I want to very first

7   focus on two elements Crystallex has to have in this case in

8   order for it to have any opportunity for recovery.

9          The first is it's going to have to prove an

10  intent to hinder and delay or defraud.  Intent is central to

11  their case.

12         And the second thing that they need, in order to

13  get any relief from this Court, and even in that event, I

14  think we find ourselves in a procedural context where we

15  will not be entitled to relief in this Court, and that is a

16  judgment in the District of Columbia in their action to

17  confirm the arbitrable award against Venezuela.

18         Without both of those elements, this claim

19  fails.  And both of those elements are central to this

20  motion.

21         The issue of intent informs the jurisdictional

22  issue under the commercial activity exception.  It informs

23  the Act of State Doctrine and its application, and the issue

24  of the DC Court having jurisdiction over it and not yet

25  having rendered a judgment on the motion to confirm the

```
 1    award informs the 12(b)(6) motion based on the immunity,

 2    prejudgment immunity of the assets of PDVSA.

 3               One thing I want to focus on before I get right

 4    to the jurisdictional issue is again to focus on the intent

 5    because, Your Honor, there is nothing wrong with the trans-

 6    action that they have alleged here, nothing whatsoever.

 7    They don't claim it violates Delaware law.  They don't claim

 8    there wasn't sufficient surplus to support the dividend.

 9    They don't claim it was a constructive fraudulent conveyance.

10               We were handed a diagram of the transaction,

11    which I know is part of the last argument before Your Honor,

12    and although it looks like a complex transaction, it was a

13    complex transaction, and although there are allegations in

14    the complaint which are irrelevant concerning attempts to

15    conceal the nature of the transaction, all of the information

16    that they put in the complaint is public information.  They

17    obviously got it off the Internet.  They got it from

18    somewhere.  They didn't get it in discovery.

19               There is no intent to conceal anything here.  This

20    is a legitimate legal transaction but for their allegation

21    that there was a fraudulent intent.  That the intent behind

22    the transaction was to hinder delay or defraud Crystallex in

23    getting a judgment.

24               In keeping that in mind, I want to focus now on

25    the sovereign immunity arguments.
```

1          They have alleged -- first of all, let's start

2     from the premise that under the Foreign Sovereign Immunities

3     Act, PDVSA, as an agency or instrumentality of a foreign

4     state, is entitled to the presumption of immunity from the

5     jurisdiction of this Court.  That is our starting point.  So

6     there must be an exception to that immunity.

7          The exception that they have invoked is the

8     commercial activity exception under Section 1605(a)(2), and

9     there are three clauses.  I'm going to address them seriatim.

10          The first clause requires that the claim be

11     based upon a commercial activity carried on by the foreign

12     state in the United States.

13          And the "commercial activity carried on in the

14     United States" is a defined term to include contact which

15     is substantial, commercial activity which is substantial,

16     substantial contact with the United States.

17          And the courts have construed that requirement

18     as being more burdensome or onerous, more substantive, if

19     you will, than even the due process requirements of minimal

20     contacts.

21          Now, here, there is no allegation that PDVSA did

22     anything in the United States.  There is an allegation that

23     PDVSA orchestrated and directed the dividend transaction, but

24     they don't say PDVSA did that in the United States.  They

25     don't say that there were meetings in the United States.  They

1    don't say there were phone calls in the United States.

2           And when you read their briefs, their argument

3    boils down to the fact that PDVSA owned a Delaware company

4    and was paid a dividend by a Delaware company, and that is

5    sufficient to meet their burden under the first clause.

6           There is no case that supports that.  We don't

7    believe that that meets the definition of commercial activity

8    carried on in the United States.  And for that reason alone,

9    the first clause doesn't apply.  But there is another

10    fundamental --

11           THE COURT:  Do you dispute under the stage

12    that we're at, a motion to dismiss, that that transaction

13    at least occurred in the United States?

14           MR. PIZZURRO:  No, Your Honor.  We do not

15    dispute that for purposes of this motion.  The transaction

16    occurred in the United States.

17           THE COURT:  And so accepting as true for now the

18    allegations that your client made that transaction happen,

19    why wouldn't it satisfy the "commercial activity happening

20    in the United States" that they made it happen in the United

21    States?

22           MR. PIZZURRO:  Because, Your Honor, that is

23    not the commercial activity of PDVSA.  That is commercial

24    activity by PDV Holdings, Citgo Holding.  All of those

25    transactions, under Delaware law, there is no requirement,

1    indeed there is no role for the shareholder in a dividend

2    transaction.  That is something which is decided upon and

3    implemented by management and the board of directors of the

4    corporation.

5            THE COURT:  Even if we take as true the

6    allegation that the whole chain began with your client.

7            MR. PIZZURRO:  Even if we do, Your Honor.

8    Because that beginning, that genesis, was not in the United

9    States.  That is our position.

10           Let me focus on another aspect of the first

11   clause which is equally important.  That is, the claim has

12   to be based upon commercial activity carried on in the

13   United States.  And to figure out whether or not they have

14   satisfied that requirement, the Court has to look at the

15   most recent decision on this by the Supreme Court in *OBB v*

16   *Sachs*.  This is a decision from December 1 of last year.

17           And I think to take the Court a little bit

18   through the facts of that case, you can see exactly how it

19   lines up with this case.

20           In *OBB*, the plaintiff, who was an American who

21   bought a Eurorail pass, or a Eurail pass, in the United

22   States.  She traveled to Austria.  She was on a platform at

23   the train station in Innsbruck.  All of these were agencies

24   of the Austrian Netherlands.  That is why sovereign immunity

25   was at issue.  She slipped and fell.  She lost her leg.

1           She brought an action against OBB as an agency

2   of the Austrian government and alleged that because an

3   element of her claim was the duty that existed between her

4   and the defendant, and that duty arose as a result of the

5   sale of the ticket in the United States, the claim was based

6   upon a commercial activity carried on in the United States.

7           The Ninth Circuit agreed, and it went to the

8   Supreme Court.  And the Supreme Court said no, no.  You

9   don't look at elements of the cause of action and determine

10  on an element-by-element basis.  What you have to do is you

11  have to look at the gravamen of the complaint.  And the

12  gravamen of the complaint was described by the Court as the

13  particular conduct that -- it is the activity that is the

14  core of the suit, the activity that actually injures the

15  plaintiff.

16          So in that case, the Court said when she

17  purchased the ticket in the United States, there was nothing

18  wrongful about that.  There was no cause of action that was

19  created always a result of that.  The activity which is the

20  gravamen of the complaint were the negligent conditions

21  alleged in Austria and, therefore, there is no jurisdiction.

22          Now, here, there is nothing wrong with the

23  transaction in the United States.  They have no claim based

24  upon the transaction in the United States alone.  Their

25  claim is based on the intent to hinder, delay or defraud.

1   And that intent indisputably has to have, if it existed, had

2   to come into being in Venezuela.

3           The core of this case is Venezuela.  All of the

4   evidence of that intent, if there was such an intent, has

5   to be in Venezuela.  All of the evidence of the relationship

6   between PDVSA and the state, which is also at the core

7   of their claim, is in Venezuela.  The pages and pages of

8   allegations concerning that relationship and why they

9   claimed that PDVSA is the alter-ego of Venezuela is all in

10  Venezuela.

11          Indeed, nothing is in the United States.  Nothing.

12  Because no one is going to contest that this transaction

13  occurred.  Of course it occurred.

14          So when you look at where their claim is based,

15  what is the conduct that is at the core?  The conduct at the

16  core, the gravamen of the case is the intent, the fraudulent

17  intent.  Because without that intent, there is no claim, and

18  that is all in Venezuela.  So their claim is not based upon

19  commercial activity carried on in the United States.

20          The second clause requires an act in the United

21  States in connection with the commercial activity in the

22  foreign state elsewhere.

23          Now, clearly, that does not apply here.  There

24  is no act that is even alleged in the United States.  Even

25  if you take the orchestration as being sufficient to satisfy

1   the first clause, we don't believe it is, and we believe it

2   doesn't matter because the based-upon requirement is not met.

3   The act was in Venezuela.  Nobody came here, nobody did

4   anything.

5           Furthermore, the courts have construed this

6   consistently with the legislative history of the Foreign

7   Sovereign Immunities Act to be an act, in and of itself,

8   must be sufficient to support the cause of action.  And,

9   clearly, whatever happened in the United States as we just

10  demonstrated doesn't support any cause of action.  There

11  isn't anything wrong with it.  The only thing that makes

12  it actionable is the intent which, of course, had to have

13  been conceived in Venezuela, not in the United States.

14          So the second clause doesn't apply.

15          THE COURT:  Is it your view that the intent only

16  happens at one moment in time?

17          MR. PIZZURRO:  I'm not sure how to answer that,

18  Your Honor, whether the intent is one that --

19          THE COURT:  Let's just say then if the facts

20  were -- and I know this isn't really what is pled, but if

21  the facts were, yes, we had a meeting on January 1st in

22  Venezuela and we came up with this plan, and then we went

23  to the United States in February and we acted on it.  Just

24  looking at the intent, wouldn't it be fair to say they

25  carried that intent with them from January into February?

1              MR. PIZZURRO:  No, I think once the intent is

2     there, the intent is there.  I think the only way Your Honor's

3     hypothetical works is that if somehow the transaction was

4     conceived and decided upon in Venezuela, and then when people

5     are sitting down in the United States, someone says there is

6     a great reason why we ought to do this, and that is to hinder,

7     delay or defraud the ability of Crystallex someday to get a

8     judgment on an arbitrable award it doesn't have yet.

9              THE COURT:  But why wouldn't it be the opposite?

10    Let's say, I know this isn't the facts, not established as

11    the facts and not exactly alleged, but let's say they had a

12    meeting in Venezuela where they had figured that all out and

13    they said out loud we're doing this with fraudulent intent

14    to hinder, delay, et cetera, and then they came into the

15    United States and did it, and there was no further discussion.

16             Why wouldn't you just assume that that intent,

17    that light bulb that went off in January was still shining

18    bright in February and that intent carried forward?

19             MR. PIZZURRO:  Well, what you are talking

20    about is not the intent carrying forward, with respect,

21    Your Honor.  I think what you are talking about is that the

22    intent formed in Venezuela continues to be the animus for

23    all the subsequent actions.  But you can't say that each --

24    then what you are saying is that each and every act by each

25    and every actor in furtherance of the transaction is imbued

```
 1    with an intent in that it is an intent that was conceived in

 2    Venezuela.

 3              THE COURT:  Well, I guess that really is the

 4    question.  Why is the intent focused so narrow as to just be

 5    at the moment that it is first created or arising as opposed

 6    to something where I formed an idea and I still have that

 7    idea and I'm continuing to act on it?

 8              MR. PIZZURRO:  Let me try to answer that by saying

 9    how would you go about proving or disproving the existence

10    of that intent?  They talk about the badges of fraud, but

11    the badges of fraud, even if you look at what they allege as

12    badges of fraud, most of them are in Venezuela.  Most of them

13    are statements that they -- you know, that Chavez made at

14    some point in time or other things that they say occurred in

15    Venezuela.

16              If you were going to have to determine, as a

17    factual matter -- we'll get to the problems with that in

18    the United States.  But if Your Honor were faced with making

19    that kind of a fact determination, that would have to be

20    based on what occurred in Venezuela.  Why did they have

21    that intent?  Why did they not?  What animated, drove this

22    transaction?  That is the key issue, not what happened

23    afterwards as a result of that intent.

24              The intent was either to point to the public

25    fisc, to alleviate what I think the Court can take judicial
```

1    notice of by reading in the newspapers what is, and has

2    been, a pretty dire financial situation in Venezuela.  It

3    had nothing to do with Crystallex or any other creditor in

4    the United States.  It had to do with trying to deal with

5    all these other issues or it was what they claim it was.

6              But you can't get that information in the United

7    States.  Who is going to tell you that in the United States?

8    Nobody.  All of that is centered in Venezuela.  And the

9    entire inquiry here that the Court is going to have to do

10   as a fact-finding issue, if we get to that point, is going

11   to have to center on Venezuela.

12             That is why the core of the case, the gravamen

13   of the case, the activity that injured the plaintiff is

14   the formation of that intent, not the implementation.  The

15   implementation was fine.  Without that intent, they can't

16   complain about the transaction.  There is no reason --

17   they have nothing to be here to talk about.  It's all

18   about intent, and that is not in the United States.  And

19   it doesn't become United States activity or something that

20   occurred in the United States because things occurred at

21   as a result of the formation of the intent, whatever the

22   intent might have been.

23             Now, the third clause is where you have a claim

24   based upon an act that occurs outside of the United States

25   in connection with a commercial activity of the foreign

1   state outside of the United States, but the act causes a

2   direct effect in the United States.

3           In this situation, we have actually the luxury

4   of a case which is pretty much on point, and that is the

5   *Kensington* decision in the Second Circuit.  And in the Second

6   Circuit, while it was not a fraudulent conveyance claim, it

7   was a civil RICO claim, the fundamental allegations were same.

8   There was a conspiracy that was entered into in order to take

9   assets that would have been available to satisfy a New York

10  judgment by the plaintiff and have those assets spirited out

11  of the United States.

12          And the Second Circuit said, there is no

13  direct effect.  There is simply no direct effect because

14  the satisfaction of the judgment could occur anywhere in

15  the world.  That was a New York judgment, a United States

16  court judgment.

17          Here, there is no judgment.  Here, there is an

18  arbitration award.  And as in the case of *Kensington,* which

19  was important in the Court's analysis, at the time of the

20  challenged transaction, there was no judgment at all.  Here,

21  at the time of the challenged transaction, there was no

22  arbitration award, much less a judgment.  So there can be

23  no direct effect in the United States.

24          A couple of other factors that I think bolster

25  that point.  And that is,

1          No. 1, this is a Canadian company.  It is not

2     even a U.S. company.  What financial impact there might be

3     on the plaintiff here is not in the United States.  It is

4     in Canada.  And,

5          The other point I would make is not only do they

6     have the option to seek satisfaction of their award outside

7     the United States, bolstering the point of the Second Circuit

8     that there is no place of performance, they're doing it right

9     now.  They've got themselves a judgment in Canada and, right

10    now, they're actively pursuing litigation in the Netherlands

11    in an attempt to get assets to satisfy this award.  So there

12    is no direct effect here.

13         I'd like to make one other point.  There seems to

14    be an implication at least, if not an outright representation

15    or argument that somehow because this is an arbitration, an

16    action on an arbitration award, because there is an action

17    on the arbitration award that that creates some sort of

18    jurisdiction in this court.

19         They make the argument I believe in two places.

20    One is with respect to a jurisdictional argument.  The other

21    is with respect to a waiver argument on the immunity for

22    prejudgment attachment, which I will get to in a moment.

23         But as long as we're talking about that right

24    now, 1605(a)(6) does provide for jurisdiction in an action

25    to enforce an agreement to arbitrate or an arbitrable award

1    if the arbitration is conducted or is subject to a multi-

2    lateral treaty to which the United States is party.  The New

3    York Convention would apply, the New York Convention applies

4    to this award.

5            The problem is this is not an action to enforce

6    an arbitrable award.  It is an action to end-run an action

7    to enforce an arbitrable award which they already instituted

8    in DC.

9            Secondly, with respect to the idea that that

10   constitutes some sort of a waiver, you wouldn't need

11   1605(a)(6), which was a specific amendment to the statute,

12   because you have already had 1605(a)(1) which provides for

13   jurisdiction where there was a waiver.

14           If Congress believed that that provision was

15   sufficient to give a court jurisdiction in an arbitration

16   situation, it wouldn't would have passed 1605(a)(6).

17           Furthermore, if the fact of that jurisdictional ex-

18   ception, that exception to immunity, provided somehow a waiver

19   to prejudgment immunity, then you would have prejudgment

20   attachment in every single action to confirm an arbitration

21   award or even to enforce an arbitration agreement.  And, of

22   course, that is not the law.  It has never happened.

23           One other point on direct effect, and we're

24   going to come back to this when we talk about prejudgment

25   immunity.  But the fact is these assets were immune

1   from their attempts if they had tried to enforce their

2   whatever they had and whatever they have now, their inchoate

3   arbitration award or now their arbitration award but no

4   judgment.  Those assets were immune.  So the movement of

5   those assets couldn't have any effect in the United States

6   because nobody could get at those assets, so that once again

7   sort of brings it back to the language of a direct effect.

8           So, Your Honor, there isn't an exception to

9   immunity that applies; and if the Court accepts that analysis,

10  that is the end of the case, at least with respect to PDVSA,

11  obviously, because that is a subject matter jurisdiction issue.

12          The affect that would have on the remainder of

13  the case is something that remains to be seen.

14          The intent issue also informs the Act of State

15  analysis.  And I know the Court had ruled on this or held it

16  ruling in abeyance without prejudice to the Citgo defendants

17  motion, but I want to make a few comments on it.

18          Focusing back on the intent issue, the Act of

19  State Doctrine is designed to preclude United States Courts

20  from getting involved in cases in which they must determine

21  the validity of an act of a foreign state based on the intent

22  of that state.  That is the *Kirkpatrick* case, and *ExxonMobil*

23  *Oil*.

24          And there is no way for this Court to avoid, if

25  jurisdiction is sustained, that inquiry.  The Court is going

```
 1    to have to determine what was behind this transaction?  Was

 2    it in fact something that was designed to prevent Crystallex

 3    from getting paid?  Or was it, in fact, an attempt to provide

 4    some liquidity either to a company that was having substantial

 5    financial problems, being PDVSA, or accepting their

 6    allegations, which is this was simply a way to get assets

 7    through to the government in Venezuela?  Was the reason

 8    behind this, was the intent behind this to fund government

 9    crucial programs by a country that finds itself in economic

10    extremism?

11              Now, that is what you are going to have to

12    decide.  That is exactly what the Supreme Court does not

13    want the United States Courts to have to get into.

14              So, with respect, even absent overt evidence that

15    this would impinge on or adversely effect the diplomatic

16    relations between United States and Venezuela, that is not

17    the only factor.  This factor is a very significant one.  We

18    think it warrants application of the doctrine under these

19    circumstances.

20              Now, a couple of observations based on what Your

21    Honor put in your decision on the Citgo defendants motion.

22              First of all, the fact that the expropriation

23    itself is not being challenged is really not an issue.  I

24    think it emphasizes the point.  The expropriation was the

25    subject of the arbitration.
```

1                    Here, the issue is the intent of Venezuela, and

2       it is a very different question.  And it is something which

3       emphasizes why the Act of State Doctrine ought to apply.

4                    It is also not true and therefore also the

5       observation that the Act of State Doctrine is not a defense

6       in an action to confirm an arbitrable award -- that is

7       accurate, but this is not an action to confirm an arbitrable

8       award.

9                    If Venezuela tried to raise the active state in

10      the action that Venezuela brought in the District of Columbia,

11      the Court would say, and rightfully so, no, that is not a

12      defense here.  You can't raise that.  But this isn't that

13      case.  This is another case where they're trying to end-run

14      that case based on an allegation of intent.  That is precisely

15      why the doctrine should apply.

16                   There has been an argument that the Act of State

17      Doctrine doesn't apply because this involves assets in the

18      United States.

19                   Well, reluctantly beating a dead horse, it has

20      nothing to do with that.  It has to do with the reasons

21      behind a lawful and valid transaction.

22                   That is Venezuela.  Everything is in Venezuela.

23      It is the exercise of a sovereign's prerogative with respect

24      to the assets of the sovereign.  And that is what they have

25      alleged.  They didn't allege that this was something that

1    PDVSA did in the course of its commercial activity because

2    they can't get at PDVSA unless they allege that PDVSA acted

3    as the alter-ego of Venezuela and, therefore, was simply

4    siphoning assets out of the United States in order to fund

5    government programs.  That is their case.  That is all in

6    Venezuela.  There is no challenge to any activity in the

7    United States.

8             If the Court has questions, I'm happy obviously

9    at any time to answer them.

10             Let me turn to now the reasons for why the

11   prejudgment immunity of PDVSA assets have to result in a

12   dismissal of the DUFTA claim.

13             I think there are two reasons here.  But what the

14   Court has to do I think is focus on, they're not -- they're

15   very clever.  This is really cleaver lawyering.  I tip my hat

16   to counsel.  Nobody has ever tried this before, so we have no

17   case to cite.  This is a case of first impression.

18             Their argument is I'm not looking for an attach-

19   ment from Your Honor.  I don't have a judgment.  I understand

20   I can't get that.

21             The judgment, if the judgment could be rendered

22   -- and we don't believe one could be by this Court on this

23   claim, and I will get to that in a minute.  But that is not

24   what the operative judgment is.  The operative judgment is a

25   judgment from the District Court in the District of Columbia.

1    That is why this is prejudgment, and let me explain why.

2                First of all, in the absence of the judgment from

3    DC, this Court is without the ability to give them relief,

4    certainly not any effective relief, and let me explain why.

5                First of all, the Court cannot order that the

6    property be returned.  That is the *Ex-Im Bank* case.  That is

7    the *Aurelius* case of the Second Circuit.

8                Those assets are not subject to the jurisdiction

9    of any court in the United States, and the Court is powerless

10   to order PDVSA or anyone else to return them.  Therefore, the

11   transaction is not avoidable.  Because the transaction is not

12   avoidable, the Court doesn't have the ability to issue a money

13   judgment.

14               But I'm going to get back to the money judgment

15   in a minute.

16               Obviously, the Court is without authority or

17   power to order PDVSA not to send its other assets in the

18   United States outside the United States.  And while Your

19   Honor said what I can do under the statute is I can order

20   PDVH -- and I'll include in the analysis, for the sake of

21   argument, PDVSA itself.  After a judgment that I render,

22   that this Court renders, as an equitable matter, I can order

23   them not to transfer any more property outside of the United

24   States.

25               Let me explain to the Court why, if that

1    occurred before there was a judgment in DC, why we don't

2    believe that that is possible.

3              The provision of DUFTA to which Your Honor

4    referred says that it is subject to normal equitable

5    principles and applicable Rules of Civil Procedure.

6              In this particular instance, they have no

7    judgment.  This is the scenario we're dealing with here.

8    They have no judgment.  And, by the way, they have no

9    assets.  They have nothing except for this chosen action.

10              If the Court were to either enjoin a transfer

11   or perhaps feel that they had the power to issue a money

12   judgment, there would have to be some security for the

13   defendants, including PDVSA.  Because if it turns out that

14   that relief was improvidently granted, PDVSA should be

15   protected; and in the normal circumstance, it would be.  In

16   the normal circumstance, if that injunction were at issue,

17   you would bond it.  You would require them to bond it in

18   order to protect the defendants in the event that they turn

19   out, at the end of the day, not to get their judgment.

20              Why do you do that?  Because it is prejudgment.

21   Why would you have to do that here?  Because it's prejudgment.

22   And it is prejudgment because the only judgment that the Court

23   can be concerned with in terms of the relief here is the

24   judgment in DC.

25              If, at the end of the day, the Court had granted

1    the injunction or, worse, a money judgment and they lost in

2    DC, that award is not confirmed, what is the recourse of the

3    defendants?  Where do they go to get back their $1.3 billion

4    if they had to pay that as a money judgment?  Where do they

5    go to be compensated for whatever damage they may have

6    suffered as a result of the improvidently granted injunction?

7              They have nowhere to go unless of course it was

8    bonded, but then it becomes circular.  Then it becomes it

9    proves itself.  The very fact proves itself if this is

10   prejudgment because the judgment that the Court has to worry

11   about is not this Court's judgment, it is that judgment.

12             Ultimately, Your Honor, this case is completely

13   derivative of, and dependent on, what happens in the District

14   of Columbia, because if Venezuela wins that action, this case

15   just goes away, just "poof."

16             And if Venezuela loses and Crystallex wins, then

17   Crystallex is going to have to try to enforce that judgment.

18   And they have said what they're going to do.  What they're

19   going to do is they're going to register the judgment,

20   they're going to come here and make the same arguments they

21   already made concerning the alter-ego of PDVSA, and they're

22   going to try to get shares of PDVH Holdings.  That is what

23   they said they're going to try to do.

24             And if they try that, okay.  But there isn't any

25   additional remedy that this Court can give them as a result

1    of this allegation of a prejudgment attachment -- of a

2    fraudulent conveyance.  They can't get any of that.  And I

3    think that sort of highlights why there is this fundamental

4    conflict between the prejudgment immunity and a DUFTA claim

5    where the judgment -- and the reason for that, Your Honor,

6    is the definition of "claim" in the statute, because claim

7    is defined as a claim whether or not reduced to judgment.

8              So a prejudgment creditor acquires an interest

9    in, and rights to, property of a prejudgment debtor.  And

10   in the normal circumstance, it makes sense; and in the

11   normal circumstance, the statute is really crafted to be a

12   prejudgment remedy, make sure that property stays.  If the

13   property is gone, get it back.  If all that fails, maybe

14   you can, maybe there is some other equitable remedy that

15   is involved, but it is all predicated to the existence of

16   a right.

17             That is a fundamental conflict with the Sovereign

18   Immunities Act, immunity from prejudgment attachment because

19   those assets are not available to satisfy the claim.

20             In Your Honor's decision, Your Honor stated

21   that a fundamental reason, a fundamental premise, to quote

22   Your Honor, "Fraudulent transfer statutes exist to preserve

23   the creditor's ability to satisfy claims.  It follows that

24   a 'debtor's property' is therefore best understood as that

25   which would have been available to satisfy the creditor's

1    claim but for the fraudulent transfer according to

2    respective corporate forum."

3             And that is precisely why property which is

4    property of the subsidiary of the debtor is not a transfer

5    of that property, it can't be fraudulent transfer because it

6    is not property of the debtor because it could not have been

7    made available to satisfy the claim.

8             The same exact analysis applies to the immunity

9    according to the assets of PDVSA prejudgment, prejudgment in

10   terms of the judgment in DC.

11            We illustrate the point.  Let's assume that

12   instead of what they claim are commercial assets in the United

13   States that the assets that they claim were fraudulently

14   transferred were Central Bank accounts, or diplomatic assets,

15   or assets held by a military organization, or military wing

16   of the government, all classifications of assets under 1611

17   which are absolutely unavailable.

18            They came to the Court and they said they

19   transferred those assets outside of the United States.  They

20   transferred those assets with an intent to hinder, delay

21   or defraud us.  The Court would have to dismiss that claim

22   because those assets under no circumstances would have been

23   available to satisfy that claim.

24            And the prejudgment immunity of PDVSA's assets,

25   the funds that the Court found were property of PDVSA in the

1    moment before they were dividended by PDVH to PDVSA, those

2    assets were immune.  They were not available to Crystallex

3    any more than Central Bank funds, any more than military

4    fund, any more than diplomatic assets.

5             And there is a case on this.  It's by analogy,

6    but it holds up pretty well.  If the Court takes a look at

7    the *EM Limited* case, the *Banco Central v Argentina*.  It's a

8    Second Circuit case.  We cited it in our brief.  It's 800

9    F.3d 78 (2015).

10            And the Court there, it's a fairly complex

11   decision, but essentially the plaintiff who had a judgment

12   against Argentina as part of the whole asset chasing against

13   Argentina, was trying to get to assets of the Central Bank.

14   And the allegation was that the Central Bank was an agency

15   of the instrumentality of Argentina, and they were trying to

16   apply the Bancec Test.  So it was a fraudulent conveyance

17   test, but they were trying to apply the Bancec Test.  And

18   the Court said:  If you wanted to argue that the arm of the

19   test which allows us to disregard the corporate forum in

20   order to avoid fraud or illegality applies based on this

21   transfer -- and I apologize.  The Central Bank had

22   transferred money out of the United States, and the Court

23   said, but there was no frustration.  There couldn't have

24   been any fraud.  There was no frustration because those

25   assets were never available to satisfy your judgment and,

1  therefore, we couldn't apply the arm or the prong of the

2  Bancec Test, which talks about unjust -- avoiding injustice,

3  fraudulent activity, misuse of the corporate forum on that

4  ground.

5          That is exactly the case here, Your Honor.

6  Those assets simply were never available to Crystallex.

7  And therein, we see, with those two illustrations, why you

8  have this fundamental conflict between state fraudulent

9  conveyance statutes and the prejudgment immunity of the

10  assets of a foreign state.  And it boils down to the

11  fundamental premise in those statutes, expressed in the

12  definition of claim, that a prejudgment creditor has a

13  right to, and an interest in, the assets of the debtor.  A

14  prejudgment creditor or, put it a different way, a creditor

15  has a claim or a right to those assets prejudgment.  And

16  that is what the statute provides.  And, obviously, that is

17  a fundamental conflict with the prejudgment immunity of the

18  assets of the foreign state.

19          Now, this is not a question of immunizing

20  conduct.  So to argue that the Sovereign Immunities Act

21  provides a foreign state is to be liable to the same extent

22  that a private person would be under similar circumstances

23  doesn't answer the question because once you identify and

24  recognize this fundamental conflict, then it's not conduct,

25  it is simply effectively either DUFTA can't apply or DUFTA

1    doesn't apply, because the underlying premise, which is the

2    frustration of the ability of the creditor to get at those

3    assets to satisfy its claim, is defeated.  It doesn't exist.

4    It doesn't exist where you have a foreign state.

5            THE COURT:  I'm going to need you to finish up

6    shortly.

7            MR. PIZZURRO:  I'm essentially done, Your Honor.

8            THE COURT:  All right.  Well, then we'll give

9    you a chance for rebuttal, but we'll hear from plaintiff.

10           MR. PIZZURRO:  Thank you, Your Honor.

11           MR. WEIGEL:  Thank you, Your Honor.  That was a

12   lot to take in.  And may it please the Court, Robert Weigel

13   for Crystallex.  Let me try to break it apart.

14           Counsel tells a very eloquent story, but it is

15   the allegations of the complaint that must be taken as

16   true here, not the representations of counsel as to where

17   decisions were made or what happened.

18           I think it's important to start with the

19   standard.  And the standard is found in a case, the most

20   recent reiteration was a case called *Simon V Republic of*

21   *Hungary*, in the DC Circuit in 2016.  And what the Court said

22   is, "When a defendant challenges the legal sufficiency of

23   the plaintiff's jurisdictional allegations, we must 'take

24   the plaintiff's factual allegations as true' and determine

25   whether they bring the case within the FSAI exception to

1    immunity invoked by the plaintiff.

2            And the Court goes on and says, "Here, the

3    Hungarian defendants would be entitled to a dismissal for

4    failure to establish jurisdiction only if no plausible

5    inferences can be drawn from the facts alleged that, if

6    proven, would satisfy the expropriation exception nexus

7    requirement."

8            And they went on in that case to find that I

9    believe that the Court had jurisdiction over the rail, the

10   railway but didn't have jurisdiction over the Republic of

11   Hungary because the only thing that was asserted was a bare

12   conclusory allegation that, quote, "property is present in

13   the United States in connection with commercial activity

14   carried on by Hungary within the United States."  The Court

15   goes on.

16           There is nothing more.  They alleged precisely

17   zero facts concerning what commercial activity, if any,

18   Hungary carries on in the United States.

19           That is the case in which the D.C. Circuit said

20   you could dismiss when there is zero facts.

21           And we did not plead zero facts, Your Honor, as

22   Your Honor knows.  What we pled is that PDVSA orchestrated

23   a $2.8 billion fraudulent conveyance with the intent to

24   deceive creditors.

25           Your Honor found, after analyzing it, that the

1    only reasonable view of the transactions as alleged is of

2    an extraction of funds orchestrated by and carried out under

3    orders of Petroleos de Venezuela, which is PDVSA, that is a

4    transfer made in every meaningful sense by the debtor.  So

5    Your Honor has already examined these allegations and come

6    to the conclusion that we stated a claim that PDVSA, the

7    debtor, made this transfer.

8              Now, they cite cases with a horrible case with

9    the woman who lost her leg on the train platform in ...

10   wherever it was.

11             THE COURT:  Austria.

12             MR. WEIGEL:  ... Austria.  Thank you, Your

13   Honor.  But in that case, there was a train ticket that was

14   sold to the United States.  And I believe that is the case

15   where the Court used what I felt was an unfortunate phrase

16   of the location where the boy's fingers were pinched.

17             Here, $2.8 billion was in a Delaware

18   corporation.  As Your Honor found, we had alleged there

19   had been a declared dividend.  That was property that was

20   available to creditors of PDVSA in the United States and

21   that property was transferred outside of the United States

22   as alleged with the actual fraudulent intent.

23             Fraudulent intent is a factual question.  And

24   it's always hard to prove fraudulent intent and previously,

25   before DUFTA, there were these badges of fraud which are

1    actually now incorporated into the statute.

2              And it says, just looking at a few of them:

3              The transfer or obligation was to an insider.

4    That is from 1304(b)(1).

5              The debtor retained possession or control of

6    the property transferred after the transfer.

7              Before the transfer was made or obligation

8    occurred, the debtor had been threatened with suit.

9              The debtor removed their concealed assets.

10             Then it talks about the value of the consideration

11   received for the transfer.

12             We have alleged these facts.  We think we can

13   prove them.  Together, those collection of facts specifically

14   by statute are allowed to infer the intent.

15             Now, we got into a somewhat I guess "angels

16   dancing on a head of a pin" discussion over when the intent

17   was formed; and I don't know how counsel is making that

18   representation as to where the intent was formed, but

19   what is important for the purpose of the statute is that a

20   transfer -- this is quoting from the statute, 1304(a).  It

21   says that, "A transfer made or obligation incurred by a

22   debtor is fraudulent if the debtor made the transfer and

23   incurred the obligation with actual intent to hinder or

24   defraud -- hinder, delay or defraud any creditor of the

25   debtor."

 1          So the question is, did they have the fraudulent

 2     intent when they made the transfer?

 3          Where was the transfer made?  The transfer was

 4     made in the United States.  It was made in Delaware.  It was

 5     $2.8 billion went from a Delaware corporation to Venezuela.

 6     And no amount of clever wording can say that a transaction

 7     where all of the major steps took place in the United States

 8     can get around the fact that this was a transfer made in

 9     the United States.

10          The commercial activity here, under 1605(a)(2),

11     under the first prong, was that PDVSA owned and operated and

12     directed the conduct of its subsidiary to cause it to make

13     this fraudulent conveyance.

14          Paragraph 7 of the complaint, Paragraph 8 of the

15     complaint, Paragraph 54, to name a few.

16          PDVSA.  Here is the allegation in the complaint.

17     PDVSA orchestrated a series of debt offerings and assets

18     transfers among PDVSA and its subsidiaries PDVH and Citgo

19     Holding that converted Citgo's value to cash, then removing

20     those funds from the United States and transferring them

21     into PDVSA's coffers in Venezuela.

22          Paragraph 8.  PDVSA directed its wholly owned

23     subsidiary PDVH, directed its wholly owned subsidiary Citgo

24     Holding to issue $2.8 billion in debt, almost all of which

25     Citgo Holdings then proceeded to transfer without any

1    consideration to its immediate parent PDVH as a shareholder

2    dividend.

3                 THE COURT:  All right.  So if I ask you when is

4    the intent that is relevant, what is your answer?

5                 MR. WEIGEL:  The intent is relevant when the

6    transfer is made.  That is what the statute said.  It is,

7    was the transfer made with the actual intent --

8                 THE COURT:  So --

9                 MR. WEIGEL:  -- to defraud.

10                THE COURT:  So is it a fair question then, and a

11   legally relevant question to ask, what time do we have to

12   have proof of intent?  And the answer is at the moment the

13   transaction is made?

14                MR. WEIGEL:  It is, the transfer has to be made

15   with the fraudulent intent.  So I don't know.  I guess it is

16   theoretically possible that someone could decide to create a

17   fraudulent intent and then not act on it, which would not be

18   actionable, and I suppose at some later point in time they

19   could come up with another intent and do it.

20                But intent is a complicated factual analysis,

21   and it's rarely proven by direct confession of the people

22   involved.

23                THE COURT:  All right.  But do you allege that

24   at the time of the transaction, the defendant we're talking

25   about now had a fraudulent intent in the United States?

1          MR. WEIGEL:  We allege that the defendant was

2    engaged in commercial activity in the United States, that

3    it had that intent.  We also allege, in Paragraph 54, we

4    talk about the fact that they have overlapping directors

5    and officers.

6          So it is a somewhat esoteric question to say

7    whether the Minister of Mines of Venezuela, acting as a

8    Director of PDVH, a Delaware Corp., which submitted itself

9    to jurisdiction in Delaware, had the same intent that he had

10   when he was acting as a Minister of Mines or when he was

11   acting as the head of PDVSA.

12         But, yes, we do allege that they made this

13   transfer, they caused a transfer to happen.  They were

14   engaged in commercial activity in the United States.  The

15   gravamen of our complaint is that that commercial activity,

16   operating a Delaware subsidiary, directing that Delaware

17   subsidiary to make a dividend with the intent of defrauding

18   their creditors is satisfied.

19         THE COURT:  Now, if the claim goes forward and

20   at the end of the day all of the proof is that PDVSA only,

21   it was only ever in Venezuela and so you get meeting minutes

22   and the recordings and it's everything you hoped for, it's

23   all this fraud, and we know they're committing fraud and

24   that is their intent, but they did that all in Venezuela.

25         Have you satisfied, have you proven your claim

1    under the statute?

2                MR. WEIGEL:  Yes, and for two different reasons,

3    Your Honor.

4                First off, the gravamen of the complaint.  What

5    actually happened, what caused our cause of action to occur

6    was the movement of the $2.8 billion, and that happened in

7    the United States.

8                They caused the $2.8 billion to be transferred

9    to Venezuela.  It didn't happen by act of weather or

10   something like that.  They must have given a bank account.

11   They must have caused the direction.

12               So, yes, under the first prong, it was a

13   commercial activity in the United States, and the gravamen

14   of our complaint arises from that commercial activity.

15               There is a second prong or really third prong of

16   the statute which talks about a claim based upon an act in

17   connection with commercial activity outside of the United

18   States that causes a direct effect in the United States.

19   And I would submit that although I believe we meet the first

20   standard, we almost certainly meet the third.

21               There is no dispute that this was a commercial

22   operation.  And the Supreme Court says, you don't look at

23   the actual intent when looking at jurisdiction.  You look

24   at the objective criteria to determine if it is a commercial

25   activity or not.

1            In other words, if you are engaging in activity

2   that is commercial by its nature, that a private citizen

3   could do as opposed to, for example, the police powers, then

4   it is a commercial activity.

5            This was the ownership of stock, the control of a

6   company, the receipt of dividends, all commercial activity.

7            If it didn't happen in the United States as Your

8   Honor premised -- I still think the gravamen occurred in the

9   United States; but if Your Honor decides differently, there

10  still was an act in connection with that commercial activity

11  that caused a direct effect in the United States.

12           And it is important to remember two things about

13  that:

14           One is that under the *Weltover* case, the

15  Court -- it doesn't have to be substantial, and  it doesn't

16  have to be foreseeable.  It has to be a direct consequence.

17  What happened here, in *Weltover*, the Court said Argentina

18  had agreed to make a payment into a bank account in New

19  York, and that money didn't show up, so that was a direct

20  effect in the United States.

21           This is sort of the converse.  We had an argument

22  before, whether it is stronger or the same as *Weltover*.  But,

23  here, there was money in the United States at the beginning

24  of this transaction.  The direct effect in the United States

25  was that that money was moved from the United States and

1   went to Venezuela.

2           And there was some assertion that, well, we're

3   Canadians so we can't benefit that from.  Well, the *Weltover*

4   expressly said a foreign plaintiff can in fact bring the action.

5           And the other thing is true that there are other

6   creditors of these companies, as Your Honor I'm sure is aware.

7   Conoco filed an action.  They are this courtroom.  There are

8   other creditors, U.S. companies as well, who have brought

9   this same action.  It doesn't depend on the citizenship of

10  the plaintiff.  The question is did they commit an act that

11  had a direct effect in the United States.

12          THE COURT:  So what about their argument from

13  *Kensington;* and that none of this was unlawful except for

14  the fraudulent intent?

15          I guess those are probably two different questions

16  but address that second one first.  The transactions at the

17  time they were made, even you don't allege there is anything

18  wrong with them unless you can prove they were done with

19  fraudulent intent.

20          MR. WEIGEL:  That's a big "if."  I was trying to

21  avoid saying the joke about asking Ms. Lincoln how she liked

22  the play.

23          If they say -- we have alleged fraudulent intent,

24  we alleged the badges of fraud to prove it, and they have not

25  moved to dismiss on the grounds we have not alleged the

1    fraudulent intent.

2              So transactions, there are probably other

3    bases that we could go after on this and the fact that it

4    probably, it made the company insolvent and so forth.  But

5    we have alleged here actual fraudulent intent and we have

6    proved it and we pled it.  Those allegations have to be

7    taken as true.

8              So, yes, I suppose you could have a transfer

9    that if it did not meet the criteria, did not have the

10   badges of fraud and was done without a fraudulent intent,

11   that there wouldn't be a problem.

12             THE COURT:  But your point is you pled the fraud.

13             MR. WEIGEL:  Our point, yes, we pled the fraud,

14   and that would be a different case.

15             THE COURT:  All right.  Then what about, going

16   back to the direct effect.  I think it is *Kensington* that

17   they cited for the fact that until you have a judgment,

18   there is no effect on you.  And you don't have a judgment,

19   so why aren't they right about that?

20             MR. WEIGEL:  Well, a couple of things, Your

21   Honor.  We do have a judgment.  We have a Canadian judgment.

22   But it is also the case that -- and I'm trying to remember

23   the name of the case.  I'm sorry.  I've got a note here,

24   Your Honor.

25             But it is the Colony, is it?  Ah.  Here we go.

1    *Cruise Connections*, D.C. Circuit (2010).

2              Nothing in the FSIA requires that the direct

3    harm, the direct effect in the United States harmed the

4    plaintiff.  That is what the D.C. Circuit said.  There just

5    has to be a direct effect in the United States.

6              In the *Saudi Arabia* case in the Supreme Court, the

7    Court noted there is a difference in the way that the three

8    elements, the three different prongs of 1605(a)(2) are set up.

9    They contrast the third prong with the first prong where they

10   say, in the first prong, it is based on, the action has to be

11   based on the commercial activity.  The gravamen has to be out

12   of the commercial activity.  The third prong, it is based on

13   an act in connection with commercial activity that has a

14   direct effect in the United States.

15             We have met that test.  There was an act, the

16   taking of the $2.8 billion.  The orchestrating of the

17   removal of the money from the United States to Venezuela was

18   in connection with a commercial activity that had an effect

19   on the United States.  Essentially the same effect as in

20   *Weltover*, only in *Weltover* the money didn't show up,    and

21   here the money was taken away, but it is the same effect.

22   The money that was supposed to be in the United States wasn't.

23             THE COURT:  So I think you are saying even if

24   it turns out you can't prove it had a direct effect on your

25   client, it satisfies the exception if you can prove that it

1    had some direct effect on the United States.

2              MR. WEIGEL:  Exactly, Your Honor.  It doesn't

3    have to be a direct effect to my client; it has to be a direct

4    effect to the United States.  That is what the statute says.

5              THE COURT:  And is it sufficient just to show

6    that the direct effect is that the money was in the United

7    States and now it isn't?

8              MR. WEIGEL:  That is what *Weltover* says.  In

9    *Weltover*, the Court said they were supposed to make a

10   payment to an account in New York.  That money never showed

11   up, and that was a direct effect in New York.

12             And I think by direct analogy, we're saying the

13   money was in the United States and they moved it out.  In

14   the end, the effect is the same.  We've got an empty bank

15   account.

16             Now, I think Your Honor analyzed the other prongs

17   of counsel's argument at some length in your decision.  They

18   did make a transfer.  We have, Your Honor ruled that the only

19   inference -- and I don't -- from the facts was that it was

20   orchestrated by the debtor PDVSA/Venezuela, but we only have

21   to prove that there was a plausible scenario based on the facts

22   we have alleged that, if proven, would establish liability here.

23             They claim they didn't have a fraudulent intent.

24   They had good intentions.  It was based upon the needs of

25   the country and so forth.

1           We would say that their express statements after

2    nationalizing, expropriating my client's bank account or my

3    client's gold mine is that they did it with the intent to

4    make sure they didn't have to pay my client's arbitrable

5    award, that they did it with the intent to not have to pay

6    Exxon's award, to not have to pay the award that Conoco was

7    seeking.  That they did this because they bluntly took a lot

8    of people's stuff in violation of a number of treaties.  The

9    chickens have come home to roost and Citgo was sitting here

10   as a place where people could get to get some satisfaction

11   for the acts that were taken against them.

12           And there is no question, this idea that if one

13   set of Delaware companies that are owned by foreign sovereigns

14   play by a different set of rules, then Delaware companies that

15   aren't owned by foreign sovereigns is nowhere in the statute.

16   As Your Honor said, the FSIA says once we get over the immunity

17   issue, the same rules apply to all of the defendants.  They

18   have the same liabilities as any other corporate defendant.

19           If Your Honor has any questions?

20           THE COURT:  Well, I guess what is your view on

21   if I follow what I decided in the context of the other

22   defendants, what is it new that I have to decide to resolve

23   PDVSA's motion?  Where are the issues different?

24           MR. WEIGEL:  They actually aren't, Your Honor.

25   That is the interesting thing.  Your Honor has already ruled

1    that there was at least "a," and Your Honor said "the" only

2    plausible scenario where they were engaged in commercial

3    activity.  They were engaged in the extraction of funds

4    that they orchestrated and carried out.  And based upon that

5    finding, at this stage, I mean we're assuming all of our

6    allegations are true and we're ultimately going to have to

7    prove them.  But at this stage, Your Honor's finding that

8    this was property of the debtor, that they were engaged in

9    the transfer I think is enough to show that there was, they

10   were engaged in commercial activity in the United States.

11           And if for some reason Your Honor does not agree

12   with that, and I think I would hope you would, there is the

13   third prong, which is this is clearly commercial activity

14   outside the U.S. that had an effect in the U.S., namely, the

15   fact there is not $2.8 billion in the United States anymore.

16           THE COURT:  Is the Act of State analysis any

17   different now that we are one step closer to being the

18   Government of Venezuela on this motion or is it your view

19   I can put that off for another day as I did before?

20           MR. WEIGEL:  I believe Your Honor can put that off

21   for another day.  There is nothing other than speculation as

22   to where -- I mean we have alleged it happened in the U.S.

23   They're saying, well, it had to have happened in Venezuela.

24   But it didn't have to have happened in Venezuela, Your Honor.

25   These individuals subjected themselves, the management of

1    PDVSA subjected themselves to jurisdiction in Delaware by

2    agreeing to be directors of a Delaware corporation.

3               They engaged in commercial activities.  And they

4    profited greatly from the fact that they owned the refinery.

5    They borrowed money in the United States.  They refined oil

6    in the United States.  They have made literally billions of

7    dollars from operating this operation here.  And if you

8    are going to operate a commercial activity, a commercial

9    enterprise in the United States, you can't then hide behind

10   the Act of State and say, well, we might have made these

11   decisions in Venezuela.

12              THE COURT:  All right.  And then looking down

13   the road, just hypothetically, if you were to prevail, I'm

14   just trying to understand a little bit more about the remedy

15   that you would be seeking.  There was some discussion of

16   that with the defendants.  What kind of relief can you

17   envision that I might grant you with respect to PDVSA?

18              MR. WEIGEL:  Thank you, Your Honor.  The statute

19   is very broad.  It allows you to issue an injunction.  It

20   allows you to put a receiver in place.  It allows you to

21   engage in any -- issue basically any order that you feel is

22   equitable under the circumstances.

23              There are a number of things that we would ask

24   for:

25              First off, we haven't briefed the issue but we

1    believe we're entitled to a money judgment against PDVSA.

2    If Your Honor can't order the money to come back, it doesn't

3    mean that Your Honor can't give us a money judgment equal to

4    the amount of money they took.

5              Your Honor could stop future dissipations of

6    assets such as the one that happened barely weeks after

7    Your Honor issued the decision.  PDVSA caused PDVH to, for

8    no consideration, to pledge half of its assets to PDVSA's

9    creditors.

10             So we start off with a company that had all

11   these assets.  They moved $2.8 billion out to Venezuela;

12   and what is left, they cut in half and said half of that

13   goes to PDVSA creditors.  We think we can undo that, but it

14   is certainly going to hinder and delay.

15             So the Court has many options, and I think it is

16   incredibly premature.  I mean we're talking about bonding;

17   right?

18             Your Honor should hear all the evidence.  You

19   will see what happened.  We think we can prove everything we

20   have alleged.  We think their conduct was deliberate and

21   intentional and designed to keep people like my client from

22   ever collecting on the award so they can keep the property

23   they took without having to pay any compensation.

24             And then Your Honor will do what is equitable.

25   The statute gives you a lot of discretion.  And whether that

1    is enjoining PDVH from making any additional transfers to

2    PDVSA, whether it is putting a receiver in place for PDVH,

3    whether it is given us a monetary judgment against PDVH or

4    PDVSA.

5           There are -- it would be great for them if they

6    would come up with the exact plan that works, and that they

7    have suddenly been "the guys."  You know, fraud conveyances,

8    I once learned from the Second Circuit, have been around

9    since the Star Chamber; and it would be interesting if these

10   were the guys who came up with the way to do it, that no one

11   else could figure out, and they figured out a way to do it.

12   And that Your Honor is powerless, I think they said, to do

13   anything about it.

14          But Your Honor is not powerless.  This Court

15   has control over the two Delaware subsidiaries.  You have

16   control over the assets here.  And even if you cannot order

17   PDVSA to bring the money back, you can order that PDVSA pay

18   money; and if PDVSA doesn't do that, then we'll have to try

19   and collect that.

20          And as for the D.C. Circuit, yes, we're entitled

21   to bring an action before we have a judgment under the

22   fraudulent conveyance, to prevent precisely this instance.

23          If I borrow a million dollars from a bank and

24   two months before the due date of my term loan, I start

25   giving all my assets to my brother-in-law, the fact that I

1    don't owe the bank money today doesn't mean that the bank

2    can't stop me from dissipating my assets so when I do owe

3    them money, I don't have any money to pay.

4                    And that is exactly what we did here.  We saw

5    that they got rid of $2.8 billion and we decided to come in

6    and see if we can put an end to it.

7                    The action in DC is fully briefed.  We expect

8    that the Court will rule in due course, hopefully quickly,

9    and that we will have a judgment probably before the next

10   time we see Your Honor, but we already have a Canadian

11   judgment which we could domesticate here in the United States.

12                   So there are many things Your Honor can do here;

13   and I think it very unlikely that we will reach the stage of

14   what Your Honor's powers are in the event that we prove our

15   claim before the DC Court rules on the confirmation of an

16   arbitrable award, which is supposed to be in, I think

17   probably is in a sense, a fairly, it is supposed to be an

18   expeditious proceeding, and we hope, and expect, it will be.

19                   THE COURT:  And you are in the District Court in

20   DC; correct?

21                   MR. WEIGEL:  Yes, Your Honor.

22                   THE COURT:  Just one other thing.  The bond

23   question was mentioned.  And I know you say that is premature,

24   but to the extent the argument was somehow your client

25   wouldn't be able to put up a bond or would refuse to, I don't

1    know if that was the argument, but did you have anything to

2    say as to that?

3              MR. WEIGEL:  I have never -- I don't think I

4    am revealing attorney-client communications.  I have never

5    discussed the issue of bond with my client, but I have no

6    reason to believe that if Your Honor required a reasonable

7    bond, my client won't be able to find the funding to post it.

8              THE COURT:  Did you understand the argument to

9    be something different than that?

10             MR. WEIGEL:  I didn't understand the argument

11   about why posting the bond somehow would require you to

12   dismiss the claim at this point, because it seemed to me to

13   be a non sequitur, but my client has a very large arbitrable

14   award against Venezuela.  It could post, for example, the

15   arbitrable award as a bond.  Your Honor might decide that is

16   sufficient.

17             By the time Your Honor gets around, gets the

18   issue in front of you, we have done our discovery.  We very

19   well may have a domesticated Canadian judgment or a U.S.

20   judgment, both of which would be assets suitable for posting

21   a bond; or we could probably go and get a conventional bond.

22             I just haven't discussed it with my client, but

23   there is no reason that my client wouldn't be able to post

24   the bond if it was a reasonable amount and there was some

25   reason for it.

1              THE COURT:  All right.  Thank you very much.

2              MR. WEIGEL:  Thank you.

3              THE COURT:  Is there any rebuttal?

4              MR. PIZZURRO:  Thank you, Your Honor.

5              I want to just comment on the last couple of

6    things that were said.  Apparently, I wasn't as clear as I

7    had hoped to be when I raised the issue of the bond.

8              It was illustrative of the fact that if the

9    Court would issue any relief in this case in advance of

10   their having an actual judgment in DC, indeed before they

11   brought it to this Court and tried to enforce it, it

12   illustrates the prejudgment nature of the relief.  If Your

13   Honor issues an injunction and they don't have a judgment

14   and then they lose -- that is the premise, they lose in

15   DC -- there has to be some mechanism that protects my client

16   and Mr. Eimer's client from the damage that they might

17   suffer because of the improvidently granted injunction.  And

18   that proves that any relief that Your Honor -- that proves

19   the prejudgment nature of what they're trying to get.  That

20   is my only point.

21             THE COURT:  It's just to illustrate that point.

22             MR. PIZZURRO:  Exactly.

23             THE COURT:  It is not making a factual argument.

24             MR. PIZZURRO:  No, no, no.  It was to illustrate

25   the point.  It was a hypothetical.

1          Something counsel said just before that colloquy

2     was very interesting.  I think I heard, and the transcript

3     will reflect it, I think I heard him admit that this is a

4     prejudgment action.  I think I heard him admit we're trying

5     to get our award recognized and enforced in DC, but we're

6     here to keep PDVSA and Venezuela from dissipating assets.

7          The judgment that this Court needs to be concerned

8     with in order to determine whether or not the immunity of the

9     assets applies and whether there is a fundamental conflict

10    between the statute DUFTA and the FSIA is the judgment in DC.

11         And I think counsel just candidly admitted, yes,

12    that is exactly what we're doing here.  We saw them getting

13    rid of assets, we saw them doing this, we saw them doing that.

14    A lot of allegations were made.  So we're here, we're trying

15    to effect a prejudgment remedy, prejudgment to DC.

16         And, again, I want to emphasize --

17         THE COURT:  Well, I think their point is they're

18    not asking me to effectuate any of those remedies now and

19    they won't unless, and until, they have a judgment in the

20    United States.  Do you disagree with that?  Is that not what

21    you are hearing?

22         MR. PIZZURRO:  The analysis I think has to be,

23    Your Honor, what can this Court do in advance of a judgment

24    in DC?  And the answer I think is nothing.  That is, all of

25    this is illustrative of that point.

1            THE COURT:  If I'm not being asked to do

2     anything before a judgment in DC, for instance, then why

3     does the logic of your argument lead to dismissal?

4            MR. PIZZURRO:  Well, it would be if this case

5     were to move faster than -- this is hypothetical, but it

6     is important in order to make the legal point.

7            If this case got to the point where the Court

8     is ready to issue judgment and grant relief and yet nothing

9     had happened on the claim in DC, what is the relief that

10    the Court can give?  Because the underlying right, they

11    don't have any additional relief that they can get if they

12    have a confirmed arbitrable award in the judgment and a

13    fraudulent conveyance.  They don't get $1.3 billion plus

14    $200 hundred million or $1.3 billion.  They don't.  They get

15    what they get; and it is entirely dependent on what happens

16    in DC.

17           And the reason for making the point, Your Honor,

18    is to illustrate the prejudgment nature of this entire proceed-

19    ing and why we're saying that we're not asking that this

20    Court do anything before it enters a judgment.  That is not

21    the appropriate inquiry.  The appropriate inquiry is whether

22    anything that this Court would do has to abide a judgment in

23    DC.  That is the only point that we're making.

24           And I think I heard counsel kind of admit, yes,

25    that is how we're trying to use this.  That is why I say I

1    understand it, I get it.  I tip my hat.  It is ingenious.  I

2    just think it is precluded by the Sovereign Immunities Act.

3              And a couple of other points that were made.

4              I'm glad counsel brought up the *Simon* case.  The

5    issue of where the intent was formed is, as I argued and we

6    believe, that is the most important issue here in terms of

7    the jurisdiction.  And under *Simon*, the D.C. Circuit said

8    you apply the *Twombly* plausible standard in determining

9    whether the allegations in the complaint would support

10   jurisdiction.

11             Now, what have they alleged in terms of where

12   intent was formed?  They have alleged exactly nothing.  Right?

13             What they have alleged, however, is that the

14   intent here is not the intent of PDVSA, it is the intent

15   of Venezuela, the republic, because the republic is the

16   debtor.  The republic is the one who participated in the

17   arbitration.  And they are using PDVSA because they're

18   essentially one and the same, et cetera, and they go through

19   what they go through, and that is part of the case, and I

20   understand that.

21             But that makes it implausible to suggest that

22   any intent could have been formed anywhere other than in

23   Venezuela.  Because they, themselves have elevated this

24   decisionmaking beyond the pay grade of anybody at PDVSA and

25   into the governmental level.  So clearly the only plausible

1    conclusion that one can draw is that the orchestration and

2    direction, which is all that they have ever alleged, that

3    is it, those two words in about three places of this

4    60-some-odd page complaint, that that resulted from an

5    intent that was formed in Venezuela.

6              And, again, in the absence of that intent, they

7    have nothing to complain about.  And they admit it, the fact

8    that the money left the United States.  If the money left

9    the United States in order to fund government programs and

10   not to delay and hinder and defraud them, then they lose,

11   and it doesn't matter whether they were hindered or delayed.

12   Because that has to be the intent.  It's not a constructive

13   fraudulent conveyance claim.  And, obviously, that was very,

14   very purposeful on their part.

15             I just heard counsel argue that, well, they

16   have these subsidiaries of the United States, and he made

17   some argument that sounded to me as if they're trying now,

18   at least at this stage, to allege some ability to pierce

19   between PDVSA and its subsidiaries in the United States.

20             There is not a single allegation in the complaint

21   about that.  All of the allegations are about the identity of

22   interest and of PDVSA and Venezuela, and they very purposely

23   avoided any allegation whatsoever that you can pierce through

24   to the very subsidiary, PDVH and Citgo Holdings.

25             And, again, the transfer, absent that intent,

1    didn't injure them.  They may be sad and sorry that there

2    are less assets that are available to them, but without the

3    intent, everybody acted perfectly legal.  The injury is

4    legal injury, it is not injury in fact.  Therefore, you have

5    to go back to the intent.

6              If I understood the argument on direct effect,

7    counsel argued that because this is commercial activity,

8    there is a direct effect in the United States.  Now, that

9    clearly is not what the statute says.

10             THE COURT:  I think the argument is there was

11   $2.8 billion in the United States and now there isn't, and

12   that that is direct effect on the United States.

13             MR. PIZZURRO:  And that is precisely the analysis

14   that counsel used, the *Weltover* analysis and *Paradigm*, and

15   that is exactly what the Court in *Kensington* analyzed.  The

16   Court in *Kensington* said you look at *Weltover*.  Why was there

17   jurisdiction in *Weltover*?  Because there was a contractual

18   obligation to pay in the United States money that was supposed

19   to be paid.  It was not paid and, therefore, that failure

20   constitutes a direct effect.

21             And from *Weltover* has sprung a ream of cases on

22   the direct effect clause and contract liability and whether

23   or not an obligation to perform is due in the United States.

24   If it's due in the United States, the failure to breach, you

25   sustain jurisdiction under direct effect.  If it's not, you

1   don't.

2          And *Kensington* looked at the judgment and said

3   can we find an obligation to pay that judgment in the United

4   States?  A U.S. judgment.  Do you have an obligation?  And

5   the Court said, no, you don't.  Unlike *Weltover*, which is

6   exactly the analysis the Second Circuit did.

7          Let's look at *Weltover*.  *Weltover* was an

8   obligation to pay in the United States.  But with respect

9   to a judgment, there is no obligation.  The foreign state

10  can satisfy that judgment anywhere in the world.  Therefore,

11  there is no commercial -- there is no direct effect in the

12  United States.

13         And this isn't an argument.  The argument about

14  the fact that it's a Canadian company simply takes away from

15  them the ability to say, well, we suffered commercial loss.

16  The commercial loss to us in the United States is the direct

17  effect?  No, because the loss to them as a matter of law

18  is suffered in Canada because that is where they are

19  incorporated.  The fact that the statute may or may not

20  require that there be a direct effect on the plaintiff is of

21  no moment because they haven't alleged a direct effect on

22  anyone in the United States.

23         THE COURT:  Well, does the statute require that

24  or is it enough that there be a direct effect on the United

25  States?

1          MR. PIZZURRO:  We believe that it does require

2     that.  That the direct effect has to be on the plaintiff.

3     There is a split in the Circuits on that issue.

4          THE COURT:  If the direct effect need only be on

5     the United States, you still say they haven't --

6          MR. PIZZURRO:  It has to be -- there is a case

7     which has directly addressed this relatively recently.  It's

8     not binding precedent.  I know the case because I'm counsel

9     in the case.  And it's in the Second Circuit.  It is called

10    *SK Fund*.  And I don't have a cite, but it is a decision that

11    came out in the past three months.

12          In *SK Fund*, the argument was made that there was

13    no direct effect on the plaintiff, foreign plaintiffs.  It

14    is a securities fraud case.

15          The Second Circuit said there is no requirement

16    in the statute that the direct effect be on the plaintiff

17    and therefore the plaintiff is not a U.S. person.  That

18    doesn't preclude jurisdiction as long as they can plead and

19    ultimately show that there was a direct effect on somebody

20    in the United States.  They have to plead it.  They have to

21    allege it.  They have to prove it.

22          Now, here, they didn't plead anything.  And what

23    Your Honor heard about other claimants in the United States?

24    First of all, it has to be as a result of this activity.

25          Those aren't -- there are no U.S. companies.

1    Those aren't U.S. companies.

2              Conoco sounds like a U.S. company.  It's not a

3    U.S. company.  It's three Dutch companies and a Bermuda company.

4              ExxonMobil, that is not a U.S. company.

5              Again, these are all foreign subsidiaries, and

6    they're foreign subsidiaries for a reason.  Because they

7    formed and did business through subsidiaries under the law

8    of countries that had bilateral investment treaties with

9    Venezuela so that they could get the benefit of the

10   arbitration provisions in those treaties.  So it is not like

11   anybody, you know, we're talking about highly sophisticated

12   people here.

13             So even if the Court were to be persuaded by

14   *SK Fund* as opposed to some of the other cases, and if the

15   Court -- we would be happy to brief this and show the Court

16   what some of the other Circuits who have addressed this have

17   held; but they haven't satisfied the test, even under the

18   most liberal, because they haven't shown that there is any

19   effect on anyone in the United States.

20             THE COURT:  All right.  The plaintiff says that

21   I basically already decided all these issues.  What is your

22   view?  What is different about your motion than the one I

23   already decided?

24             MR. PIZZURRO:  The difference in my motion, Your

25   Honor, is that I represent sovereign.  This is a subject

1    matter jurisdiction motion, and none of this was before the

2    Court before.  I mean it's as fundamental as one could get.

3    The Citgo subsidiaries are not entitled to sovereign

4    immunity, PDVSA is.  If PDVSA is entitled to sovereign

5    immunity, this Court lacks subject matter jurisdiction.

6              All of these issues have to be looked at fresh.

7    They have to be looked at in terms of the arguments that are

8    before Your Honor now and we don't believe can be informed

9    by things that the Court may have said on earlier motions.

10   Certainly, none of that can bind PDVSA.  PDVSA wasn't before

11   the Court then.  PDVSA hadn't been served and its time to

12   answer hadn't happened.

13             THE COURT:  I think I am answering a different

14   question, though.  Sovereign immunity was definitely argued

15   to me, wasn't it?

16             MR. PIZZURRO:  No, Your Honor.  It was not.  As

17   I understand what was argued to Your Honor, it was not that

18   any of the -- are we talking about the Citgo subsidiary's

19   motion?

20             THE COURT:  Correct.

21             MR. PIZZURRO:  No, there was no sovereign

22   immunity that was raised.  The argument, as I understand

23   what was argued there, was that the immunity to which -- the

24   prejudgment immunity to which PDVSA's property -- PDVSA is

25   alleged is to be the debtor -- is entitled preempted the

1    DUFTA claim and therefore the DUFTA claim under 12(b)(6) had

2    to be dismissed, but the issue of whether or not PDVSA was

3    entitled to sovereign immunity obviously could not be raised

4    or decided in the absence of PDVSA.

5             THE COURT:  All right.  So obviously your client

6    is entitled to be heard, and is being heard, and I'm going

7    to keep working on it, rest assured.  But my question is I

8    suppose more pedestrian.

9             If, after analyzing it all, I still think that I

10   decided the issues correctly that were in front of me, is

11   it your view that none of those issues are the same issues

12   presented in your motion?

13            MR. PIZZURRO:  None of the issues that Your

14   Honor decided are on our motion to dismiss under 12(b)(1),

15   no.  There are similar issues with respect to the 12(b)(6)

16   portion of the motion, and that would include the Act of

17   State, and it would include the failure to state a claim

18   based on the irreconcilable conflict that we believe existed

19   between DUFTA and the FSIA in terms of prejudgment of the

20   assets of foreign states.

21            THE COURT:  All right.

22            MR. PIZZURRO:  Some of our arguments are

23   different.  I would hope Your Honor would look at that with

24   a fresh eye.  But is Your Honor bound?  Obviously, Your

25   Honor is not bound by anything that was done previously.

```
1              Are the issues the same in some respects?  In

2      the broadest sense of the term, yes, on those two issues,

3      they are.

4              THE COURT:  We are well over the time I already

5      allocated, but if you have any concluding things you want to

6      say, of course, you may.

7              MR. PIZZURRO:  No.  Thank you, Your Honor.

8              THE COURT:  All right.  Is there anything you

9      want to add?

10             MR. WEIGEL:  May I have two minutes, Your Honor?

11             THE COURT:  Sure.

12             MR. WEIGEL:  I'll try to be very quick.

13             First off, on the issue of where the effect has

14     to impact.

15             The Cruise Connections case, which is a D.C.

16     Circuit case, and it is fairly recent, in 2010, says:

17     "Nothing in the FSIA requires that the direct effect in the

18     United States harm the plaintiff.  The commercial activity

19     exception requires only that the foreign government's act

20     outside the territory of the United States caused the direct

21     effect to the United States."

22             So there isn't a requirement -- and I'm not

23     familiar with the case counsel cited, but there isn't a

24     requirement that the direct effect impact the plaintiff.

25     There is a requirement that the claim be based upon an act
```

1    in connection with commerce, commercial activity outside the

2    U.S. that caused the direct effect in the United States.

3    That is the third prong.

4              We think we also meet the first prong.

5              As to the argument that because we're Canadian,

6    we don't get it.  In *Weltover*, the Court said, "Argentina's

7    suggestion that the direct effect requirement cannot be

8    satisfied where the plaintiffs are all foreign corporations

9    with no other connections to this country is untenable under

10   *Verlinden v Central Bank of Nigeria*."  That argument was just

11   rejected by the Supreme Court.

12             Finally, with respect to the *Kensington* case,

13   that was a case where there was no connection with the

14   United States.  It was a RICO case involving actions

15   involving the Congo.

16             Here, the gravamen of the complaint all relies

17   upon -- and in that case, the Court held that the scheme,

18   the RICO scheme that was alleged could have all taken place

19   without any connection at all to the United States.  In our

20   case, the gravamen of our complaint is all taking place

21   with regard to Delaware corporations, the transfer of

22   $2.8 billion that was in the United States.

23             This is not a question of was there some

24   requirement that somebody paid it in.  The money was here

25   and then it is not because they moved it, and that is the

1    direct effect.

2            Thank you, Your Honor.

3            THE COURT:  Thank you.  Any last word on your

4    motion?

5            MR. PIZZURRO:  In fact, *Kensington* involved the

6    allegations of a RICO scheme in the United States to abscond

7    with assets that were in the United States with the intent

8    to defraud the ability of the plaintiff to satisfy its New

9    York judgment.  Those are the facts of *Kensington* as to

10   which the Second Circuit said there is no direct effect

11   because there is no obligation to pay in the United States.

12   That's all.

13           Thank you.

14           THE COURT:  Okay.  Thank you very much.  We'll

15   take that motion under advisement.

16           I do want to give a few moments at least to

17   argue, if you wish, the motion for the interlocutory appeal

18   by PDVH or Citgo defendants, so welcome.

19           MR. EIMER:  Good afternoon, Your Honor.  Nate

20   Eimer on behalf of PDV Holding.

21           I realize Your Honor has been here quite a long

22   time this afternoon.  I think the issue of the 1292(b)

23   motion is pretty well briefed.  I might only make a couple

24   of comments briefly.  If Your Honor has questions, I'm happy

25   to answer them.

1          I think maybe for the first time, we do agree

2    with Crystallex on one issue; and that is that respectfully

3    I know Your Honor gave it a lot of consideration and you

4    held an extensive argument, but we do disagree with Your

5    Honor's opinion, and that is the reason we're seeking to

6    appeal it.  And so it is not with any disrespect for the

7    Court, but that is the gravamen of a 1292(b) motion is that

8    we disagree with it.

9          I think it is almost indisputable that we have

10   met the four criteria for a 1292(b) motion.  It is clearly

11   within the Court's discretion.  I might mention just a

12   couple things that are important.

13         We did take, as Your Honor may know, a

14   collateral appeal of the FSIA portion of the order to the

15   Third Circuit.  The Third Circuit has now scheduled briefing

16   on it.  Our initial brief on the FSIA issue is due January

17   23rd, I believe, and briefing following that by the

18   plaintiff, and then reply by us.

19         I think it would be expeditious, as long as the

20   Third Circuit is taking that issue, to bring the DUFTA issue

21   before the Court as well.  It seems the two do interrelate.

22         I also think it would be helpful probably to the

23   Third Circuit if Your Honor reframed the 1292(b) issue that

24   this Court would like the Third Circuit to address as part

25   of the collateral appeal of the FSIA order.  So I think

1    certification of both issues with clearly facilitate this.

2    It is indisputable, it seems to me, these are both central

3    controlling questions of law in this case.  I don't see how

4    anyone could argue otherwise.  But for those issues, we

5    would be gone by now.

6            There is certainly substantial grounds for

7    disagreement.  Your Honor has struggled long and hard with

8    it.  I think either side has found clear controlling

9    authority on this, on either issue actually.  I think, I

10   mean I mean no criticism, but Your Honor had to resort to

11   a Webster's dictionary to find some interpretation of the

12   DUFTA statute.

13           We disagree with that, of course.  I think that

14   interpretation might be appropriate in some circumstances

15   but not for us as essentially the holder of the asset.

16           If the owner of the asset and the debtor was

17   somehow claiming it wasn't the transferor but the holder was

18   the transferor, I think the interpretation Your Honor gave

19   to the word "buy" might inform the Court as to whether the

20   transfer was by the debtor, but since we're not the debtor,

21   as the Court recognized, I don't know if that assists that

22   at all.

23           Certainly, I think there is no doubt that it

24   will materially advance the litigation.  We now have three

25   cases basically hinging on Your Honor's ruling on the FSIA

1    and the DUFTA.  There is this Crystallex case.  They have

2    another Crystallex case which is predicated on PDVH being a

3    debtor now, not because we owe them money but because we're

4    a defendant in this case.  So if we're no longer a defendant

5    in this case, then Crystallex II falls, so that case is

6    sitting there.  And the Conoco case which counsel referred

7    to is sitting there, and it will raise exactly the same

8    issue because it is predicated on the same transaction.

9    We'll be filing the same motion to dismiss, so ...

10                THE COURT:  Is it fair, in analyzing whether

11   it materially advance this case to certify, to consider the

12   impact it might have on those other cases?

13                MR. EIMER:  Yes, I think there is some precedent

14   for that, Your Honor.  I think it was in *Ford Motor* where

15   the Court said there are multiple litigations and that the

16   Court could consider its docket and how it is going to

17   advance other related litigation with respect to that.

18                Certainly, we have exceptional circumstances

19   here.  I'm sorry.  It was the *Chase Manhattan* case, not the

20   *Ford Motor*, it was at 324 F2d, I believe at 24, that talked

21   about pending cases and how the Court should consider those.

22                Clearly here I think we have exceptional

23   circumstances:  The complexity of these issues, I think the

24   uniqueness of the circumstance, and the time it is going to

25   take to resolve this all I think warrant trying to get an

1    expeditious resolution from the Third Circuit, which is

2    going to be I think resolving one of the issues anyway.  And

3    so I think it would be helpful for the Court and for the

4    Third Circuit to have both these issues framed by the Court

5    and brought to the Third Circuit at that point.

6              THE COURT:  Remind me.  If I certify, does that

7    mean the Third Circuit has to take it or do they then make a

8    discretionary decision?

9              MR. EIMER:  They have a discretionary decision

10   as well.

11             THE COURT:  There is a process by which a

12   question of state law could be certified to the Delaware

13   Supreme Court.  I know you haven't asked me for that.

14             MR. EIMER:  Right.

15             THE COURT:  Is that something I should consider

16   on the DUFTA question?

17             MR. EIMER:  You could.  I think actually the

18   Delaware Supreme Court, I think as we cited in our reply

19   brief, has focused on cases pretty close to it where there

20   is a subsidiary that transferred assets, and the trustee in

21   bankruptcy sued on that.  The Delaware Supreme Court

22   affirmed.  That was the *Spring Hill* case that we cited from

23   the Chancery Court.  That has been affirmed, and it is cited

24   in our reply brief.

25             I think we have fairly close now Delaware

1    Supreme Court authority on that question, though there is a

2    tweak here that is a little different because at this point

3    we're transferring assets that are arguably the assets of

4    the debtor at this point.

5         I think the seriousness of this really strikes

6    me because at this point, we're just, PDVH is, under Your

7    Honor's holding, is basically a holder of the assets of

8    the debtor and transferring them, and it is really hard to

9    see how this ruling doesn't have very broad implications

10   generally that I think need to get straightened out.

11        I don't know that we're in any different

12   position than a bank or a trustee who is holding assets of

13   the debtor and, pursuant to directions from the debtor,

14   transfers those assets, and then there is a DUFTA claim

15   brought against the trustee.

16        We're not a debtor.  There is nothing wrong with

17   what we did other than those assets belonging supposedly to

18   PDVSA who is allegedly the alter-ego and allegedly has an

19   unlawful intent to transfer and hinder.  No one implied we

20   had that intent.

21        So if Your Honor really held that we are an

22   instrumentality no more than any another holder of an asset

23   following directions of the debtor, the implications of the

24   opinion are extremely broad, and I really think getting

25   Circuit Court review would be important.

1          THE COURT:  I'm sure you saw part of what the

2     plaintiff has argued in response is that further transactions

3     have occurred and presumably will occur and that it is at

4     least possible that the Third Circuit would agree with me

5     and what we may have done is just create more time for more

6     fraudulent transactions.  Do I need to be concerned about

7     that?

8          MR. EIMER:  I think the fastest way to resolve

9     this and to bring it within Your Honor's jurisdiction and

10    control is to find out from the Third Circuit what the law

11    is.  I mean at this point, I don't think Your Honor can

12    issue an injunction anyway.  I think we've heard that from

13    PDVSA this morning.

14         These are assets of a sovereign that I don't

15    think this Court has jurisdiction to arrest.  Until there

16    is a judgment, there is no judgment.  I think the -- and

17    I'll get back into this.  Your Honor raised this question a

18    little bit earlier.  The separation of the remedy from the

19    liability from the claim seems to me disingenuous and futile.

20         Essentially what the plaintiff here is arguing

21    is that the conduct prejudgment is unlawful, but they're not

22    going to seek a remedy until later, but that still an arrest

23    of movement.  The idea prejudgment conduct can be unlawful

24    certainly is going to arrest the movement of those assets

25    which the FSIA says this Court can't do.

```
 1              So I think we need to find out from the Circuit

 2   whether that was right or not, because I think it is directly

 3   conflicting with the FSIA and conflicting and hindering

 4   sovereign movement of assets already by creating this apparent

 5   liability.  And they were here today saying they were going to

 6   ask for money judgments, they're going to ask for appointment

 7   of receivers.  There is a whole range of horrendous results

 8   coming from this which is threatening not only this sovereign

 9   but any other sovereign that looks at this Court's opinion.

10   And I think review of that is important under the most

11   expeditious basis possible.

12              THE COURT:  All right.

13              MR. EIMER:  Thank you, Your Honor.  I appreciate

14   it.

15              THE COURT:  I'll hear from plaintiff.

16              MR. WEIGEL:  Your Honor, I have the most respect

17   for my adversaries who are very smart and effective attorneys.

18              It is very easy to see why they want to have

19   this go up on a partial record.  They're just like a bank,

20   they say.  They don't want -- Your Honor's decision was, you

21   know, all of these fraudulent conveyance cases are intensely

22   factual, and the question here is what is really the factual

23   record?  What was the full extent of PDVSA's control and

24   involvement?  Did they even bother to maintain the pretense

25   or did they just order it?
```

```
 1                    They don't want the Court to see, they don't
 2       want the Third Circuit to see the actual facts.  They want
 3       to be able to argue that they're just like a bank.
 4                    THE COURT:  Well, help me understand that
 5       because I would assume if the Third Circuit took it, they
 6       would have to take as true what you have alleged in your
 7       complaint.
 8                    MR. WEIGEL:  True, but there would be a more
 9       fulsome factual record, the general rule.  I mean every
10       motion to dismiss, at least if it is fully heard on the
11       complaint, would further the lawsuit I suppose if it was
12       granted, and if the Court of Appeals reversed the District
13       Court, then that would be great.  But that is not the system
14       we have.  Taking it up on an interlocutory appeal is the
15       rarity, not the norm.
16                    And the concerns they raised, I mean the statute
17       is quite clear that a trustee or an attorney or other
18       advisor who hasn't acted in bad faith doesn't have liability
19       here.  And if what Your Honor's decision does is deter
20       people from making fraudulent conveyances, that is what the
21       statute is supposed to do in the first place.
22                    The real concern here is that they did not deny
23       it, and they did not offer any explanation, but right after
24       Your Honor ruled that one of the things you might do is
25       enjoin them from further transfers of assets, they went out
```

1    and immediately transferred half their assets, and we're

2    going to end up with a six month delay or a year delay.

3                    I believe Your Honor is right, and I believe we

4    will win the appeal in the Third Circuit, and I'm not really

5    that concerned about going up and arguing it.

6                    But what I am concerned about is the delay that

7    would be caused by sitting on our hands and not getting

8    these documents because we will have to undo the transfer

9    they just made.  That is when we filed the other suit.

10                   And it is a little like the proverbial patricide

11   arguing for mercy because he is an orphan.  They transferred

12   half the assets, and then they come in and say we're going

13   to be restrained from doing this kind of thing.

14                   Well, it wasn't a very effective restraint

15   apparently.  But it is making things -- they didn't come up

16   and say they weren't going to make anymore asset transfers.

17   They didn't say let us go up to the Third Circuit.  We

18   promise to maintain the status quo until that is decided.  I

19   didn't hear that from anybody.

20                   The main concern I have is that -- and I'm not

21   sure Your Honor, even if you allow it to go up, has to stay

22   discovery because we can do document discovery.  This is a

23   narrow window of facts.  This is a transaction that was

24   planned.  I don't know whether it was within a six month

25   time frame, but it probably wasn't longer than that.  It's

1    one transaction we're looking at.  We can get the documents

2    from the Delaware corporations very easily.

3               And if this is truly an attempt to let's get the

4    Third Circuit to decide and we really want to know that and

5    not an attempt to get a six months delay or a year delay

6    while the Third Circuit has briefing and so forth, then why

7    not do discovery.

8               I raised the law school exam; and I apologize,

9    Your Honor; but there is a question to me of whether, by the

10   way they have done this, that there is actually jurisdiction

11   for Your Honor to consider the 1292(b) question, which is

12   the exact same question as they have taken up on appeal.

13              My understanding is that the removal of this

14   Court's jurisdiction is very limited on an interlocutory

15   appeal, and that Your Honor can continue to conduct the case.

16   But in this case, it is the exact same question that they are

17   asking you to certify they have already filed an appeal on.

18              Personally, if we're going to do this once,

19   I'd like to do it once.  My client doesn't have infinite

20   resources, as they pointed out, and if we're going to go to

21   the Third Circuit, it takes money.  But I think there is a

22   concern whether the Court has the power to make a 1292(b)

23   certification on a question already up on the Third Circuit.

24              There are two questions that they asked for.

25   One is the DUFTA question and the other is the FSIA

1    preemption of DUFTA.  And it's the FSIA preemption of DUFTA

2    which -- and I didn't quite understand the distinction

3    that was made previously.  There was some sense of the

4    Citgo defendants are not asserting sovereign immunity, but

5    they apparently are.  But that is the one that is up on

6    appeal right now in the Third Circuit.  So that one is going

7    to get heard.

8            I don't think this is a case that warrants

9    1292(b) certification.  I think this is an ordinary motion

10   to dismiss.  They have not pointed out any case and Lord

11   knows we have able counsel on both sides, and this is a

12   uniform act that is in most of the cases, and there has not

13   been a single case that anyone ever found that said the

14   uniform act is preempted by the Foreign Sovereign Immunities

15   Act.

16           Thank you, Your Honor.

17           THE COURT:  So as you say, one of the issues is

18   already in front of the Third Circuit.

19           MR. WEIGEL:  We believe improperly, but yes.

20           THE COURT:  Improperly, and I'm unclear on are

21   you moving to dismiss that appeal?

22           MR. WEIGEL:  Well, we were going to move to

23   dismiss, Your Honor.  But the Third Circuit scheduled briefing

24   and the briefing is so close in time that I think we'll

25   probably just brief it.

1              THE COURT:  So if those are the realities, you

2    still don't want to also just deal with the DUFTA claim as

3    well up there at the same time since you are already there?

4              MR. WEIGEL:  These folks do not have any immunity

5    from the DUFTA claim.  The Delaware corporations, the Citgo

6    defendants don't have any.  And I can certainly see some

7    advantages to having it all appealed at once, but I can also

8    see that the Third Circuit would benefit by having a full

9    record where we actually got access to the documents, and

10   they could know precisely what the transaction was valued,

11   precisely what was said to who, and then they could apply to

12   these facts to what is admittedly a very broad and general

13   statute, purposely so because the creativity of people trying

14   to avoid their creditors is somewhat infinite.  So it is an

15   intensely factual determination; and we think that the Third

16   Circuit would benefit from having a factual record in front

17   of it.

18             THE COURT:  You don't have a judgment in the

19   U.S. yet.  We have already talked about that.

20             In terms of delay, it would seem to be a factor

21   how quickly you think you are likely to have a judgment in

22   the U.S., and you suggested the proceedings in Washington

23   are meant to be somewhat expedited, but for purposes of

24   figuring out this motion and trying to decide if the Third

25   Circuit really would delay what is going on here, help me

1   assess what you think is going on in terms of when you are

2   going to have a judgment in the United States.

3            MR. WEIGEL:  I've been told that no later than

4   March, we will have a judgment in the United States that is

5   fully briefed, but I would be less than candid if I told you

6   that was based on anything other than counsel's guess as to

7   when the Judge ruling on it is going to get to rule.  But it

8   is fully briefed, and it is sub judice.

9            THE COURT:  And the Third Circuit appeal is

10  scheduled to be fully briefed February or March, it sounded

11  like.  The briefing begins late January?

12           (Counsel confer.)

13           MR. WEIGEL:  March?  I believe March, Your Honor.

14           MR. EIMER:  (Nodding head.)

15           MR. WEIGEL:  Yes, January 22nd is their brief,

16  and then our brief follows, and then a reply.

17           THE COURT:  Is there anything else you want to

18  add?

19           MR. WEIGEL:  No, Your Honor.  Thank you very much.

20           THE COURT:  All right.  You can come back, if

21  you would like.

22           MR. EIMER:  Just one second.

23           I think Your Honor was exactly right.  These are

24  legal issues.  Your Honor was able to rule on the 12(b)(6)

25  motion based on our accepting the facts as pled.  Those are

1    sufficient for Your Honor to rule on.  The Third Circuit

2    will do it exactly the same thing.

3            In taking one of these issues up when there are

4    really two that are the foundation of the Court's ruling, it

5    seems like a waste of time.  You really ought to get both of

6    them up.

7            So I think the Court, it would serve the Court

8    here and I think the Third Circuit as well by bringing them

9    before the Court because in some sense they're interrelated,

10   and I think the Court should see them.  So we would urge the

11   Court to certify both the issues so they can both be in

12   front of the Third Circuit.

13           THE COURT:  There was a suggestion, I don't

14   think it was in the briefing, that perhaps the question of

15   discovery and whether it should be stayed is a separate

16   question.  Do you have a view on that?

17           MR. EIMER:  Not at this point, Your Honor.  That

18   is not before the Court at this point.

19           We do have a question whether we should brief the

20   Crystallex II motion to dismiss which I think is due tomorrow,

21   which is going to involve essentially the assumption we're a

22   debtor because PDVSA, PDV Holding continues to be a defendant

23   here, so our briefing would be dependent on the validity of

24   that original holding.  And it seems silly to go through

25   another argument and round of briefing until we understand

 1  what the Third Circuit is going to do with respect to at least

 2  the FSIA question.

 3           So the only thing that is before the Court today

 4  is that motion to delay the briefing on Crystallex II on the

 5  motion to dismiss.  That's the only thing that is ripe.

 6           THE COURT:  And that is your client; is that

 7  right?

 8           MR. EIMER:  Yes, Your Honor.

 9           THE COURT:  All right.  So let's just talk about

10  that for a moment.

11           MR. EIMER:  Sure.

12           THE COURT:  I mean I'm not prepared to rule on

13  the certification motion today.

14           MR. EIMER:  I understand.

15           THE COURT:  I hope to do it soon, but there are

16  these holidays and things coming up.

17           MR. EIMER:  I understand.

18           THE COURT:  I don't know exactly what that

19  means, but I want to do it soon.  Your brief or something is

20  due tomorrow.

21           MR. EIMER:  Yes.

22           THE COURT:  Right?

23           MR. EIMER:  Our brief is due tomorrow on the

24  complaint filed by Crystallex in their second case.  We

25  would be moving to dismiss again.

1          THE COURT:  That is the one where I ordered the

2     status report.

3          MR. EIMER:  I believe so.  Yes, Your Honor.

4          THE COURT:  So your response is not going to be

5     an answer, it's going to be a motion to dismiss.

6          MR. EIMER:  Correct.

7          THE COURT:  And your request is you would have

8     at least some time after I rule on the certification question?

9          MR. EIMER:  We could do that.  Actually, our

10    request would be to wait until the week we're done in the

11    Third Circuit, one way or another.  Because if they dismiss,

12    the appeal is dismissed or denied or whatever, that is one

13    thing.  If the Court overturns, then that changes the

14    briefing altogether.

15          So I think at this point, until we know what is

16    going to happen in the Third Circuit, we would defer briefing

17    on these same issues all over again.

18          THE COURT:  As an interim step, is it helpful if

19    I extend the date for your response to a week after I rule

20    on the certification motion?

21          MR. EIMER:  Sure.  Absolutely.  Maybe we can

22    come back and visit again, if Your Honor would allow us to.

23          THE COURT:  Would there be an objection if I

24    were to do that?

25          MR. WEIGEL:  I have no objection if Your Honor

1    wishes to give them an extension as a matter of courtesy

2    and practicality, so that they don't have file something

3    tomorrow.

4              But we're quite uncomfortable with the delay.

5    They come to us saying it's very reasonable but they just

6    pledged assets against $3.4 billion worth of debt.  Half of

7    the company's assets just got pledged, and against that

8    you are weighing some very minor discovery obligations and

9    a motion to dismiss which, I don't know, we have not heard

10   anything about why, but we want this to move quickly because

11   we're at risk.

12             THE COURT:  All right.  Did you want to respond?

13   Among the concerns they raise is that your clients are not

14   representing that they are going refrain from further

15   transactions.  They also raised the discovery issues, but I

16   take your position to be don't worry about discovery today.

17   We may have a dispute over stay of discovery or not,

18   depending on what I do on the certification.

19             MR. EIMER:  Correct.

20             THE COURT:  So what about, should I infer

21   anything from your silence in response to their concern that

22   money is just going to keep leaving the country if I let

23   this be delayed?

24             MR. EIMER:  Your Honor, I can't make any

25   representations about that.  That is certainly not something

1    I conferred with anybody about or that I have any control

2    over.  Nor do I actually think -- and I think PDVSA would

3    probably agree with this.  Nor do I think the Court can stop

4    it right now.

5                    And I think if these are assets of the

6    sovereign, as we believe they are, the sovereign has the

7    jurisdiction, and that is a judgment that Congress made.

8    And they have no judgment.  As soon as they get a judgment,

9    then they can take whatever remedies they have.  But

10   Congress made a decision that until there is a judgment,

11   sovereigns are free to move their assets.  And I think that

12   whether Crystallex likes it or not or others like it or not,

13   that is the judgment that Congress made.

14                    THE COURT:  Okay.  Thank you.  Is there anything

15   else?

16                    MR. EIMER:  No, sir.

17                    THE COURT:  Did you want to say anything about

18   anything you heard on behalf of PDVSA?

19                    MR. PIZZURRO:  No, Your Honor.

20                    THE COURT:  All right.  Is there anything

21   further from the plaintiff?

22                    MR. WEIGEL:  Yes, Your Honor.  That I think you

23   just heard the reason why we would ask that however Your

24   Honor decides the 1292(b) motion that you structure it in

25   such a way that it does not delay us so all we have done is

1    sit on our hands while they continued to dissipate assets.

2              We disagree with their characterization that

3    this Court is powerless to do it.  But we all agree I think

4    that once a judgment is entered by Your Honor, and we would

5    of course have to -- DUFTA is an independent claim.  We

6    would have to prove up our status as creditors, whether we

7    do that as a DV judgment or otherwise, but we have a great

8    interest in getting these cases resolved as quickly as

9    possible so that we can get to the point where Your Honor

10   can enjoin them.  Thank you.

11             THE COURT:  Thank you.  I'm going to take it

12   all under advisement but for I am ordering that the

13   defendants response in I think what we're calling the second

14   case, but the one on which there was a status report --

15             MR. EIMER:  Yes, sir.

16             THE COURT:  -- will not be due until seven days

17   after I rule on the motion to take a further certification,

18   interlocutory appeal in the first case.  And we'll get an

19   order entered to that effect.  And as I say, I'm going to

20   try to resolve that motion soon.

21             MR. EIMER:  Okay.  Thank you.

22             THE COURT:  Any questions about that?

23             MR. EIMER:  No, sir.

24             THE COURT:  Any questions about that, or

25   anything else?

1          MR. WEIGEL:  Nothing, but my colleague tells me

2    that we also have papers that are due tomorrow.

3          THE COURT:  Okay.

4          MR. WEIGEL:  Our opposition to their request for

5    a stay.

6          THE COURT:  In that same action.

7          MR. WEIGEL:  In that same action.  Can we ask

8    our papers be due at the same time at their motion to

9    dismiss?

10         THE COURT:  Any objection to that?

11         MR. EIMER:  None, Your Honor.

12         THE COURT:  All right.  Well, I imagine what I

13   just said to add the plaintiff's obligation as well, and

14   we'll try to put that all in an order.

15         MR. WEIGEL:  On behalf of several people sitting

16   at the table.  Thank you.

17         THE COURT:  You're all welcome.

18         Well, thank you all very much.  I hope you get

19   to enjoy the holidays.  Safe travels.  We will be in recess.

20         (Hearing ends at 4:58 p.m.)

21

22         I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

23

24                         /s/ Brian P. Gaffigan
                            Official Court Reporter
25                          U.S. District Court